**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **KENNETH AITKEN, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:06cv1161** |
| | ) | |
| **COMMUNICATIONS WORKERS** | ) | |
| **OF AMERICA, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION

This federal question action grows out of defendants' alleged misappropriation of the identities of certain plaintiffs – twelve managers at Verizon Business Network Services ("Verizon") – for the purpose of sending pro-union, anti-Verizon emails to Verizon employees under the managers' names.  Defendants Harry Arnold and Pam Tronsor, acting as agents of defendant Communications Workers of America ("CWA"), allegedly created Yahoo email addresses using the names of nineteen Verizon managers, including twelve plaintiffs, and then used those email addresses to send unsolicited emails to numerous Verizon employees.  These emails falsely appeared to originate from the Verizon managers and disparaged Verizon while touting the benefits of unionization with CWA.  Based on these allegations, twelve of the nineteen aggrieved Verizon managers, joined by Verizon and MCI Communications Services, Inc., filed this action alleging the following seven claims: (i) violation of the CAN-SPAM Act, 15 U.S.C. § 7704, (ii) false endorsement, in violation of the Lanham Act, 15 U.S.C. § 1125, (iii) a state claim for misappropriation of the individual plaintiffs' names, (iv) a state claim for false

light invasion of privacy,[1] (v) a state claim for defamation, (vi) a state claim for violation of Virginia's anti-spam statute, 18 Va. Code § 18.2-152.3:1, and (vii) a state claim for common law conspiracy.  The CAN-SPAM Act claim is asserted only on behalf of plaintiff Verizon.  The common law conspiracy claim and the Virginia Anti-Spam Act claim are asserted on behalf of all plaintiffs.  The remaining claims are asserted only on behalf of the individual plaintiffs.  All claims are asserted against all three defendants.

Plaintiffs seek injunctive relief, compensatory and punitive damages in an unspecified amount, and costs and fees.  Defendant CWA moved to dismiss the two federal claims pursuant to Rule 12(b)(6), Fed. R. Civ. P., and further urged the Court to decline supplemental jurisdiction over the remaining state law claims.  Defendants Arnold and Tronsor joined CWA's motion, and also moved to dismiss the claims against them pursuant to Rule 12(b)(2), Fed. R. Civ. P., for lack of personal jurisdiction.

These motions were fully briefed and argued orally, following which a bench ruling issued denying the motion to dismiss for lack of personal jurisdiction and the motion to dismiss the CAN SPAM Act claim for failure to state a claim.  The remaining motions were taken under advisement.  Since then, the parties have reported that a settlement of this case is impending, and thus this Memorandum Opinion records only the reasons for the bench ruling and does not reach the matters taken under advisement.

---

[1] The common law torts for invasion of privacy are (i) unreasonable intrusion upon a plaintiff's seclusion, (ii) public disclosure of true, embarrassing, private facts about a plaintiff, (iii) publicity which places the plaintiff in a false light in the public eye, and (iv) misappropriation of a plaintiff's name or likeness for commercial purposes.  Virginia has codified the last of these torts at Va. Code § 8.01-40, and Virginia courts have interpreted this provision as implicitly precluding the other three privacy torts.  *WJLA-TV v. Levin*, 564 S.E. 2d 383, 395 n.5 (Va. 2002).  Thus, false light is not an actionable tort in Virginia.

**I.**[2]

Plaintiffs in this case are Verizon Business Network Services, Inc. and MCI Communications Services,[3] both Delaware corporations with their principal place of business in Virginia, and twelve individual Verizon managers: Kenneth Aitken, Ronald Beausoleil, Jeffrey Burk, Kathryn Caldwell, Brian Campbell, Michael Canavan, Craig Gilbert, Michael Halliday, Dwayne Lahmann, Cindy Liddy, Deborah Stegman, and Charles Vitelli. The individual plaintiffs reside in various states, namely Pennsylvania, New York, West Virginia and Ohio; none reside in Virginia.

Defendant CWA is an international labor union headquartered in Washington, DC and is alleged to conduct business regularly in Virginia. Defendant Arnold is an Organizer for CWA Local 13000 in Philadelphia. Defendant Tronsor is a CWA District Organizing Coordinator in Philadelphia. Both defendants reside in Pennsylvania.

The complaint alleges that Arnold and Tronsor set up free Yahoo email addresses in the names of the plaintiff Verizon managers, as well as seven other Verizon managers who are not plaintiffs in this action. Between September 20 and October 10, 2006, Arnold and Tronsor used these addresses to send a series of emails to hundreds of Verizon employees at their Verizon business email accounts. The emails, which were unauthorized and unsolicited, did not identify themselves as advertisements, but essentially urged the recipients to join CWA, noting that

---

[2] As is appropriate when resolving a motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., the facts recited herein are derived from the complaint and from documents referenced therein, namely the emails, the contents of which are undisputed. *See Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

[3] These two corporate plaintiffs do business as "Verizon Business," and are herein conveniently referred to jointly as "Verizon."

3

unionized Verizon employees have better job security, benefits, and pay than their non-unionized

counterparts.  By way of example, the body of the first email, sent September 20, is reproduced

here (with some minor typeface, margin, and similar cosmetic changes):

> FYI – Verizon Business Employee:
>
> Now that MCI has been purchased by Verizon, the company is doing all it can to keep you and other former MCI employees from gaining Union benefits and wages that your co-workers at Verizon receive.
>
> Unionized Verizon workers are members of CWA or IBEW and:
> *     earn a lot more money
> *     have a better health plan and pay less for it
> *     have an excellent defined benefits pension plan and 401(k) plan
> *     have excellent job security
>
>      CWA-represented Verizon workers have some of the strongest contract protection against forced transfers, lay-offs, and downgrades of any union members in the country.  In 2002, Verizon laid off more than 3,400 workers in the Northeast – and then 7 months later, an arbitrator ruled that the contract had been violated and Verizon had to recall them all, with full back pay!
>
>      But former MCI employees can be laid off for any reason – with no recourse.  Lay-offs have already begun around the country without regard to seniority, skill, past performance, or any other set criteria.  For instance, Michelle Dash, a NYC dispatcher with five years of MCI/VZB experience was just let go without warning, while more recently hired employees remain on the payroll.  Her work record was spotless – but she was told she was no longer needed and was offered no opportunity to move into another job.
>
>      It doesn't have to be this way for former MCI employees.  CWA is committed to helping former MCI employees gain the respect and dignity you deserve.  When we join together, we can win.
>
>      This may be the last time CWA will be able to email you at work, so it is extremely important that you contact us!  Call us today at 1-800-[number].  *** We will keep all of your information confidential.***
>
>      If you don't want to call just yet, please e-mail us at [defendant Arnold's work email address] with your personal e-mail so we have a way of communicating in the coming months.  We will add your e-mail to our

*unity@verizon* e-newsletter so you can receive important updates and information, some of which the company won't want you to know.

We look forward to working with you and your co-workers to improve pay, benefits, and working conditions at Verizon Business.

United We Bargain, But Divided We Beg!

The emails were sent to Verizon employees at their respective email addresses "@verizonbusiness.com," the servers for which are located in Virginia, meaning that every email sent by defendants passed through Virginia servers.  Moreover, although most of the recipients were residents of other states, some recipients were Virginia residents.  It appears the emails contained no hyperlink or other automated method by which the recipients could "opt out" of receiving further emails, nor did they explicitly identify any other means whereby recipients might opt out of receiving further emails.  It is also clear that the emails did not contain a valid physical postal address for any of the defendants, nor identify any of them as the real senders of the email.  One email, however, contained defendant Arnold's email address as a means by which interested recipients might contact CWA, along with a toll-free number to contact the national CWA.  Another email contained defendant Tronsor's phone number as a point of contact and identified her by name, but not as a sender or author of the email.  The Yahoo addresses from which the emails were sent were valid return addresses, that is, the email recipients could send a reply email to those addresses, which would be delivered.  Defendants contend some of the emails were blocked by Verizon's spam filter, and accordingly were not seen by the Verizon employees to whom they were directed.  And finally, it is clear that the plaintiff Verizon managers did not authorize defendants to utilize their names for any purpose, including setting up email accounts or sending messages from such accounts.

After discovering the existence of the emails, Verizon filed this action, naming "John Doe" defendants and claiming a violation of the Computer Fraud and Abuse Act. *See* 18 U.S.C. § 1030(g) (private right of action). Early discovery disclosed the identities of the senders and recipients of the emails, allowing plaintiffs to file the amended complaint at issue here.

At issue in the motions decided from the Bench were the following questions:

(i) Does the Virginia long arm statute constitutionally reach defendants Arnold and Tronsor on the basis of their sending the emails at issue, given that the emails were sent to servers located in Virginia and were directed to some Virginia residents?

(ii) Does the CAN SPAM Act provide a remedy for a provider of internet access services where, as here, the defendants' false and misleading spam emails were sent to the provider's employees via the provider's servers as part of a labor organizing campaign?

## II.

It is well settled that resolving a challenge to personal jurisdiction requires a two step inquiry: first, ascertaining whether the forum state's long-arm statute authorizes personal jurisdiction, and second, if so, determining whether the reach of the statute in those circumstances exceeds the statute's constitutional grasp. *Christian Science Board of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001).

Arnold and Tronsor appropriately do not contest the first step in the analysis; they do not contest that Virginia's long arm statute, by its terms, reaches their conduct in sending the emails. Thus, the Virginia long arm statute authorizes personal jurisdiction over persons who cause tortious injury by an act within Virginia, Va. Code § 8.01-328.1(3), and importantly, "use" of a computer or computer network located in Virginia constitutes an act within Virginia. Va. Code § 8.01-328.1(B). A person "uses" a Virginia computer when he "attempts to cause or causes a

computer or computer network to perform or to stop performing computer operations." Va. Code § 18.2-152.2(4). And "computer operations" are broadly defined to include "arithmetic, logical, monitoring, storage or retrieving functions and any combination thereof," as well as "any function for which that computer was generally designed," an expansive category that surely includes the sending and receiving of email to and from business computers over a business server. Thus, Virginia's long arm statute, by its terms, authorizes personal jurisdiction over Arnold and Tronsor because they sent the allegedly tortious email messages to Virginia computers over Virginia servers, thereby causing the Virginia computers and networks to perform functions for which they were generally designed. The only remaining question is whether this application of the long-arm statute passes due process muster.

Given that the asserted causes of action arise out of defendants' contacts with Virginia, only specific personal jurisdiction is implicated. *See Christian Science*, 259 F.3d at 216. In these circumstances, courts use a three-pronged test in determining whether specific personal jurisdiction is constitutionally appropriate: (i) did the defendants "purposefully avail" themselves of the privileges of conducting activities in the forum, (ii) does the claim arise out of these activities, and finally (iii) is the exercise of jurisdiction reasonable? *Id.*

There can be no doubt that Arnold and Tronsor purposefully availed themselves of the privilege of conducting affairs in Virginia by (i) intentionally sending scores of emails to "@verizonbusiness.com" email addresses, the servers for which are located in Virginia, and (ii) transmitting the emails to the targeted Verizon employees, including some employees located in Virginia. Again, Arnold and Tronsor do not dispute (i) that they sent the emails, (ii) that the emails were intentionally directed at Verizon servers, (iii) that the Verizon servers are located in

7

Virginia, nor (iv) that some of the emails reached Virginia recipients.  Instead, they argue that because they believed the emails would be received only by Pennsylvania residents, they did not purposefully avail themselves of the privileges of conducting activities within Virginia.  Yet, this argument fails because it ignores the essential nature of spamming and other intentional torts committed via computers and the harm these torts cause.[4]  As the General Assembly of Virginia well understood, those who commit these torts via computer and the Internet know, or reasonably should know, that servers are either targets of their conduct or the means by which their tortious conduct is given effect.  Thus, courts have sensibly recognized that a spammer may not avoid personal jurisdiction by "simply pleading ignorance of where these servers were physically located," nor by pleading ignorance of the email recipient's location.  *See Verizon Online Services v. Ralsky*, 203 F. Supp. 2d 601, 611-20 (E.D. Va. 2002) (discussing purposeful availment in spam cases at length).  A contrary result would permit spammers and other tortfeasors to escape jurisdiction simply by turning a blind eye to the natural consequences of their actions.  Here, defendant knew or reasonably should have known that by sending the emails to Verizon email addresses, their messages would necessarily go to Verizon servers.  That they did not know the precise location of this server is of no constitutional moment, for it is reasonable to conclude that defendants purposefully availed themselves of the privilege of conducting activities wherever the target server was located – in Virginia.  Other courts, for essentially these reasons, have reached the same result.  *See Ralsky*, *id.*; *Internet Doorway, Inc. v.*

---

[4] Spamming is intentional conduct essentially directed at, among others, servers and their owners.  Indeed, the CAN SPAM Act permits private actions only by providers of "internet access services," *see infra* note 5, and before that Act, spammers were frequently sued for trespass to chattels on the theory that they overwhelmed and damaged a plaintiff's servers.  *See, e.g., Verizon Online Services v. Ralsky*, 203 F. Supp. 2d 601 (E.D. Va. 2002).

*Parks*, 138 F. Supp. 2d 773, 779-80 (S.D. Miss. 2001) (personal jurisdiction appropriate in any

forum where spam email received); *EDIAS Software Int'l, LLC v. BASIS Int'l., Ltd.*, 947 F. Supp.

413, 420 (D. Ariz. 1996); *accord ALS Scan Inc. v. Digital Service Consultants, Inc.*, 293 F.3d

707, 714 (4th Cir. 2002) (state may exercise personal jurisdiction over defendant who

electronically directs activity towards a state with the manifested intent of engaging in business

or other interactions there, and the activity creates a cognizable cause of action).

     Defendants contend that *Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002)

mandates the conclusion that purposeful availment is not satisfied here.  This argument also fails

as *Young* is distinguishable; it was not a spam case and did not involve the active, intentional

conduct of sending emails to a specific internet address and server.  Rather, in *Young* personal

jurisdiction was found not to exist where it was premised on the defendant newspaper's posting

of an allegedly defamatory story on its website located on a server outside the forum, but capable

of being viewed within the forum.  *Id.* at 261-62.  To be sure, posting material on a passive

website on servers located outside the forum, but accessible to persons within the forum,

typically does not, by itself, subject the entity responsible for the posting to the jurisdiction of the

forum.  *See, e.g., ALS Scan,* 293 F.3d at 713-14 (4th Cir. 2002) ("a passive web site that does little

more than make information available to those who are interested in it" does not justify exercise

of jurisdiction) (quoting *Zippo Mfg. Co. v. Zippo Dot Com*, 952 F. Supp. 1119, 1124 (W.D. Pa.

1997)).  In due process terms, merely posting material on a website located on a server outside

the forum does not manifest any intent to engage in business or other interactions in the forum

simply because the site can be visited by viewers within the forum.  *Id.*  In short, *Young* is easily

distinguished, whereas *Ralsky* and *Internet Doorway,* the spam cases, are apposite and point

persuasively to the conclusion that the purposeful availment test is satisfied here based on defendants' intentional transmission of emails to servers and recipients in this forum.

Since Arnold and Tronsor purposefully availed themselves of the privileges of conducting affairs in Virginia, it remains only to consider the remaining prongs required for specific personal jurisdiction, namely whether the asserted causes of action arise out of Arnold and Tronsor's contacts with Virginia, and whether the exercise of personal jurisdiction over them is reasonable. Both questions are easily answered in the affirmative. It is clear that these causes of action are directly related to the transmission of the allegedly tortious emails, and thus the second requirement for specific personal jurisdiction is met. Finally, with regard to reasonableness, the exercise of jurisdiction must merely comport with "fair play and substantial justice." *Burger King v. Rudzewicz,* 471 U.S. 462, 476 (1985) (internal citations omitted). Where, as here, a defendant has purposefully directed his activities at a forum, he "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477. Such considerations may include, in appropriate cases, the burden on the defendant, the forum's interest in adjudicating the dispute, and any pertinent interests of the interstate judicial system. *Id.* (citing, *inter alia, World Wide Volkswagen v. Woodson,* 444 U.S. 286, 292 (1980)). Here, Arnold and Tronsor have not made a modest, let alone a compelling case that the exercise of personal jurisdiction over them in a Virginia forum is unreasonable. The inconvenience to them of litigating in Virginia is neither extraordinary nor of constitutional magnitude. Importantly, Virginia plainly has a valid interest in providing a forum for its domiciliary corporation Verizon, and no compelling reasons exist for litigating the case elsewhere. In sum, the exercise of personal jurisdiction over Arnold and Tronsor in Virginia is reasonable. Because

the purposeful availment and reasonableness prongs are both satisfied, and because the CAN

SPAM claims are related to Arnold's and Tronsor's contacts with Virginia, it follows that the

exercise of specific personal jurisdiction is constitutionally appropriate. *See Christian Science*,

259 F.3d at 215-16.

### III.

Next, all defendants contend that the complaint's CAN SPAM Act count, 15 U.S.C. §

7701 *et seq*, must be dismissed pursuant to Rule 12(b)(6), Fed. R. Civ. P., for failure to state a

claim.

The Act was passed to combat the "extremely rapid growth in the volume of unsolicited

commercial electronic mail," which imposes costs on recipients and on Internet access providers,

businesses, and other institutions which invest in email infrastructure.  15 U.S.C. § 7701(2), (3),

(6).  To achieve this purpose, and because spamming may mislead consumers and burden

Internet service providers in many ways, Congress provided for a variety of ways in which the

Act might be violated, several of which are alleged here.  Although the complaint captions only

one count as a CAN SPAM claim, this count, read charitably, alleges that defendants' emails

violate the Act in four distinct ways:

(i) the emails contain materially false or misleading headers, 15 U.S.C. § 7704(a)(1),[5]
(ii) the emails do not clearly and conspicuously identify themselves as advertisements, 15

---

[5] This provision provides, in pertinent part, that it shall be

unlawful for any person to initiate the transmission, to a protected computer, of a
commercial electronic mail message, or a transactional or relationship message,
that contains, or is accompanied by, header information that is materially false or
materially misleading.

15 U.S.C. § 7704(a)(1).

U.S.C. § 7704(a)(5)(A)(i),

(iii) the emails do not provide an automated method for recipients to "opt out" of further emails from the sender, 15 U.S.C. § 7704(a)(3), 15 U.S.C. § 7704(a)(5)(A)(ii), and

(iv) the emails do not contain a valid physical postal address of the sender.  15 U.S.C. § 7704(a)(5)(A)(iii).[6]

Claims (ii), (iii), and (iv) all require (1) that the emails at issue be "commercial electronic mail messages," and (2) that defendant's conduct constitutes a "pattern or practice" of spamming violations.  *See* 15 U.S.C. § 7704(a)(5); 15 U.S.C. § 7706(g).  Defendants contest both of these requirements.  And while defendants do not contest that the emails contain no automated method to opt out, they nonetheless argue that this requirement should not be enforced against them. Further, defendants do not contest that the emails include no physical address of the sender, nor that the emails do not identify themselves as advertisements, but they argue this is of no legal moment as the nature of the emails as advertisements would be obvious to a reader.

And finally, claim (i), which alleges a spamming violation based on misleading header information, does not require an allegation of a pattern or practice of violations, unlike claims (ii)-(iv).  Instead, this claim requires only that the emails be "commercial" or "transactional or relationship" emails.  And here, defendants argue that the emails at issue are neither

---

[6] The last three cited provisions provide in pertinent part that

It is unlawful for any person to initiate the transmission of any commercial electronic mail message to a protected computer unless the message provides –
(i) clear and conspicuous identification that the message is an advertisement or solicitation,
(ii) clear and conspicuous notice of the opportunity . . . to decline to receive further commercial electronic mail messages from the sender, and
(iii) a valid physical postal address of the sender.

15 U.S.C. § 7704(a)(5)(A).

"commercial" nor "transactional or relationship" emails, and that the email headers at issue are not materially false or misleading. Each of defendants' contentions is separately addressed.

*A. The Emails Are "Commercial"*

Defendants first argue that the emails were not "commercial electronic mail messages." The Act defines "commercial" emails as those "the primary purpose of which is the commercial advertisement or promotion of a commercial product or service (including content on an Internet website operated for a commercial purpose)." 15 U.S.C. § 7702(2)(A). The Act also directs the Federal Trade Commission to promulgate regulations to clarify when an email's "primary purpose" is commercial. 15 U.S.C. § 7702(2)(C). The FTC has done so in the regulations that now appear at 16 C.F.R. § 316.3(a). That regulation provides, importantly, that only emails that qualify as commercial speech with the meaning of the First Amendment are "commercial" under the Act. 16 C.F.R. § 316.3 n1. Thus, an email is subject to regulation by the Act only if it is commercial speech within the meaning of the First Amendment. *See also* 70 Fed. Reg. 3110-01, 3124 (Jan. 19, 2005) (Final Rule) (assuming application of regulations only to commercial speech). Aside from this point, the regulations primarily concern whether emails with both "commercial" content and other content have a primarily commercial purpose; these mixed content provisions, summarized in the margin,[7] are not without some complexity, but need not be

---

[7] The regulation provides that an email "shall be deemed to be commercial" based on the following "criteria." First, an email consisting entirely of advertising content *per se* has a primary purpose which is commercial, and is therefore subject to the Act. 16 C.F.R. § 316.3(a)(1). Second, an email containing both advertisement and other content (whether or not that other content is "transactional or relationship" content) is "commercial" if a recipient interpreting the subject line of the email would likely conclude the message contains advertisement. 16 C.F.R. § 316.3(a)(2)(i), (a)(3)(ii). Third, an email containing both advertisement and "transactional or relationship" content is commercial if the "transactional or relationship" content does not appear, in whole or substantial part, at the beginning of the body

considered here because the emails are, in essence, a sales pitch for union representation along with CWA contact information. Thus, resolution of whether the emails are "commercial" within the meaning of the Act turns on whether union representation is a "commercial" service, and whether promoting it is commercial speech. Accordingly, the analysis next considers this issue.

Defendants raise two arguments why the emails were not "commercial:" (i) as a matter of law, unions are non-profit entities and do not engage in commercial activity, and thus their organizing efforts do not promote a "commercial service" regulated by the Act, and (ii) assuming *arguendo* that union membership is a "commercial service," the emails were not attempts to solicit union membership. Neither argument is persuasive. As plaintiffs correctly respond, CWA's status as a for-profit or non-profit entity cannot control whether promotion of CWA's services is commercial speech in First Amendment terms,[8] nor is its status as a union controlling. As to the former, well-established First Amendment law makes clear that the commercial status of speech is not determined by the speaker's profit motive. *See Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 482 (1989) ("[S]ome of our most valued forms of

---

of the email. 16 C.F.R. § 316.3(a)(2)(ii). Finally, an email containing both advertisement and content that is not "transactional or relationship" content is commercial if a "recipient reasonably interpreting the body of the message would likely conclude that the primary purpose of the message is the commercial advertisement or promotion of a commercial product or service." 16 C.F.R. § 316.3(a)(3)(ii). Illustrative factors relevant to this interpretation include the placement of advertising content at the beginning of the email's body, the proportion of the message devoted to advertising, and "how color, graphics, type size, and style are used to highlight commercial content." *Id.*

Note that while the above summary has used the term "advertising" in the interest of brevity, the regulation always uses the term "commercial advertisement or promotion of a commercial product or service."

[8] Since the CAN SPAM Act and its implementing regulations are intended to apply only to First Amendment commercial speech, the statutory term "commercial" should be construed to be coextensive with First Amendment commercial speech.

fully protected speech are uttered for a profit."); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 494 (1995) (Stevens, J., dissenting) ("[E]conomic motivation or impact alone cannot make speech less deserving of constitutional protection, or else all authors or artists who sell their works would be correspondingly disadvantaged."); *Adventure Communications, Inc. v. Kentucky Registry of Election Finance*, 191 F.3d 429, 440-442 (4th Cir. 1999) ("In and of itself, profit motive on the speaker's part does not transform noncommerical speech into commercial speech.") (internal citations omitted).  In sum, speech is neither *per se* commercial merely because of the presence of a profit motive, nor *per se* noncommercial merely because the speaker does not intend to make a profit.  Instructive in this respect is *Village of Schaumberg v. Citizens for a Better Environment*, which held that certain charitable solicitations were non-commercial speech, not because the speech was made by a non-profit charity, but because the solicitations did "more than inform private economic decisions and [are] not concerned with providing information about the characteristics and costs of goods and services."  444 U.S. 620, 632 (1980).  Instead, whether speech is commercial depends on whether it "proposes a commercial transaction" or promotes specific products or services.  *Board of Trustees of State University of New York*, 492 U.S. at 473; *Village of Schaumberg*, 444 U.S. at 632.[9]  The instant emails provide information about the characteristics of a service and promotes that service, namely CWA representation.  Thus, the emails are "commercial" under the Act.

Nor are the instant emails *per se* non-commercial merely because they relate to union activities.  In this respect, the Supreme Court has all but held that labor union speech may be

---

[9] The rule that the speaker's for-profit or non-profit status does not control is a sensible one, as many entities organized as non-profits are essentially commercial and compete against for-profit businesses, including some hospitals, insurance providers, HMOs, and the like.

commercial in nature.  *See Debartolo v. Florida Gulf Coast Bldg and Const. Trade Council*, 485 U.S. 568, 576  (1988) ("We do not suggest that communications by labor unions are never of the commercial speech variety and thereby entitled to a lesser degree of constitutional protection.")

Defendants argue the contrary, relying chiefly on *Thomas v. Collins*, 323 U.S. 516 (1945), in support of the proposition that union organization efforts are *per se* non-commercial speech, and thus (i) are not regulated by the Act by its own terms, or (ii) may not constitutionally be regulated by the Act to the extent it purports to do so.  *Thomas* cannot bear the weight of defendants' argument.  There, the Supreme Court held invalid a criminal contempt conviction based on a labor organizer's failure to obtain an organizing license before giving a speech. Although the Supreme Court noted that labor unions "cannot claim special immunity from regulation," it also stated that for this restraint (a licensing requirement, enforced by contempt) of the organizer's speech to be justified, that speech had to represent a clear and present danger, which it did not, and accordingly, the speech was protected.  *Id.* at 530-33.

Importantly, *Thomas* neither compels nor, indeed, even invites the conclusion that all union speech is non-commercial as a matter of law.  First, as one state court has noted, *Thomas* was decided "three decades before the Supreme Court developed the modern commercial speech doctrine in [*Bigelow v. Virginia*, 421 U.S. 809 (1975)] and [*Virginia State Board of Pharmacy v. Virginia Consumer Council*, 425 U.S. 748 (1976)]."  *See Kasky v. Nike*, 27 Cal.4th 939, 965 (Cal. 2002).  Accordingly, it would be surprising were *Thomas* to be considered as definitively answering the question whether labor organizing can be commercial speech.  Instead, *Thomas* is best read as standing not for the broad proposition that union organizing speech always receives full First Amendment protection, but for the limited proposition that union organizing speech

16

typically receives some First Amendment protection – a conclusion that is perfectly consistent

with such speech being commercial.  Consistent with this, recent cases cite *Thomas* merely for

this more modest proposition, or for propositions not relevant here.[10]  Finally, the seminal

*Virginia State Board of Pharmacy* case also suggests that *Thomas* is consistent with treating

some union speech as commercial, because it cites the example of labor disputes as proof that

speech does not lose First Amendment protection merely because it relates to commercial or

economic activity.  *See* 425 U.S. at 762.  In short, *Thomas* does not foreclose the possibility of

treating union speech as commercial.

It is also clear that application of the CAN SPAM Act to misleading union speech does

not, as CWA contends, pose any difficult First Amendment questions about the Act's validity

which should be avoided by statutory construction.  Courts have sensibly concluded that while

unions enjoy great latitude in their choice of language in labor disputes or organizing campaigns,

fraudulent misrepresentations of fact are unprotected by the First Amendment, even when made

by labor unions.  *See, e.g., San Antonio Community Hospital v. Southern Cal. Dist. Council of*

*Carpenters*, 125 F.3d 1230, 1237 (9th Cir. 1997) (use during picket of banner falsely claiming

"this hospital is full of rats" unprotected and properly enjoined) (citing other cases).  This is

merely a straightforward application to unions of the general principle that before commercial

speech receives any protection under the First Amendment, that the speech "must concern lawful

activity and not be misleading."  *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of*

---

[10] *See, e.g., Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 386 (1998)
(Rehnquist, J., concurring in part and dissenting in part) (citing *Thomas* to mean "union
solicitation of employee views and support is protected First Amendment activity"); *Healthcare
Ass'n of New York State v. Pataki*, 471 F.3d 87, 97 (2nd Cir. 2006) (citing *Thomas* to mean "the
First Amendment protected union speech not protected by the NLRA").

*New York*, 447 U.S. 557, 566 (1980).  Thus, to the extent the Act is applied only to fraudulent or misleading speech, it poses no difficult First Amendment questions, as unions can claim no special privilege to engage in misleading representations of fact.  In sum, as the cases cited here reflect, First Amendment jurisprudence does not compel the conclusion that union organizing speech is *per se* non-commercial, nor prohibit application of the CAN SPAM Act to misleading speech by labor unions.

The question still remains whether CWA representation is, as a factual matter, a "commercial service."  At the threshold, it is inappropriate to conclude as a matter of law that such representation is non-commercial.  While union organizing certainly implicates First Amendment associational interests, it is also true that CWA performs economically valuable services for its members in exchange for a fee, namely union dues – an arrangement which has all the characteristics of a commercial transaction.  Further, the statutory purposes of labor unions, namely "dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work,"[11] are all services performed for a fee in the marketplace, both by competing unions and by other commercial enterprises (*e.g.* law firms, arbitrators, mediators, and the like), with whom the CWA effectively competes.  Thus, it is apparent that a solicitation to join CWA may promote a "commercial service" within the meaning of the Act, and thus that emails promoting CWA representation may be regulated by the Act.

Defendants next argue that even if union membership is a "commercial service," the emails' primary purpose was "not to advertise or sell anything,"and thus that the emails are not

---

[11] *See* 29 U.S.C. § 152(5).

"commercial" emails subject to the Act.  Instead, defendants argue, the emails were mere "preliminary" efforts (i) to inform Verizon employees that their unionized counterparts enjoyed superior pay, benefits, and job security, and (ii) to solicit contact information from the Verizon employees.  Because these "preliminary" emails did not solicit Verizon employees to join the CWA, defendants argue, they were not primarily "commercial" in nature, even assuming a union provides a commercial service.  But a communication need not be an attempt to consummate a transaction *immediately* in order to be commercial in nature; advocating the benefits of the speaker's commercial product or service in hopes of later "sealing the deal" is sufficient.  *See, e.g., Rushman v. City of Milwaukee*, 959 F. Supp. 1040, 1043 (E.D. Wis. 1997) ("[S]tatements encouraging a future economic transaction" are commercial speech).  Thus, given that CWA representation is a commercial service, defendants' promotion of CWA representation in the emails is not excluded from the Act merely because it did not seek to enroll the email recipients immediately.

In sum, the emails are not appropriately characterized as non-commercial at the threshold stage, and accordingly the complaint cannot be dismissed for that reason.

*B. The Emails are "Transactional or Relationship"*

Even assuming the emails were not primarily "commercial," plaintiffs argue an alternative ground for not dismissing the complaint, namely, that the emails are "transactional or relationship" messages.  As noted earlier, the Act forbids misleading header information in connection with either "commercial electronic mail messages" or "transactional or relationship messages."  15 U.S.C. § 7704(a)(1).  Plaintiffs contend the emails are "transactional or relationship messages" because the Act defines those terms to include, *inter alia*, "an electronic

mail message the primary purpose of which is . . . to provide information directly related to an employment relationship or related benefit plan in which the recipient is currently involved, participating, or enrolled."  15 U.S.C. § 7702(17)(A)(iv).  There is no dispute that the emails provided information to Verizon employees related to their employment relationship and benefits – to wit, that unionized Verizon employees enjoyed better pay, job security, and benefits than the non-unionized recipients.  But defendants cogently counter that the emails are not "transactional or relationship messages" because to be so, the sender and recipient of the email must be in a relationship.  In other words, defendants, as strangers to the employment relationship between the recipients and Verizon, do not qualify to send transactional or relationship email messages.  In support of this argument, defendants cite the Notice of Proposed Rulemaking in which the FTC announced its intention, *inter alia*, to promulgate rules concerning the transactional or relationship email provisions of the Act.  The Notice states that "the [FTC] would not interpret the term 'transactional or relationship message' to include an initial unsolicited message that proposes a transaction."  70 Fed. Reg. 25426-01, 25434 (May 12, 2005).  As yet, this limitation has not made its way into a Final Rule or the Code of Federal Regulations, and accordingly, the quoted language from the Notice has little legal force at this time.  Moreover, the statute does not explicitly make "transactional or relationship" status depend on the sender's identity as an employer or agent thereof, and the operative statutory language, "directly related to an employment relationship or related benefit plan" is certainly broad enough to encompass the solicitations at issue here.  It is difficult to see why a call to unionization based entirely on a promise of improved wages and benefits is anything other than "information . . . directly related to an employment relationship or related benefit plan in which the recipient is currently involved,

participating, or enrolled." 15 U.S.C. § 7702(17)(A)(iv).  Accordingly, it would be inappropriate

to conclude at this threshold stage that the emails are not transactional or relationship emails.

*C. The Emails Violate the CAN SPAM Act*

Defendants finally argue that even if the emails are governed by the Act, they (i) do not

contain materially false or misleading header information, nor (ii) fail to satisfy the Act's

requirements that regulated emails identify themselves as advertisements and provide for an

automated opt out method.

With respect to the prohibition on misleading headers, defendants emphasize that not

every technical inaccuracy in a header is actionable; rather, the header must be *materially* false or

misleading to give rise to liability.  *See Omega World Travel v. Mummagraphics, Inc.*, 469 F.3d

348 (4th Cir. 2006).  The instant headers are not materially misleading, defendants contend,

because it would be apparent to a reasonable reader that the emails did not actually originate

from Verizon managers, but from union organizers.  In this regard, defendants cite to *Omega*

*World Travel*, where the Fourth Circuit affirmed summary judgment in favor of a CAN SPAM

defendant who sent emails that incorrectly indicated the server from which they originated and

contained a non-functional "from" email address.  *Id.* at 357-58.  The Fourth Circuit found the

emails not materially misleading and in compliance with the Act's "opt out" requirements,

emphasizing that the emails were "chock full" of ways to identify the true sender, that each

message contained an opt out hyperlink, that each message prominently displayed a number to

call for more information, and that each message listed a valid physical address and local phone

number.

While *Omega World Travel* sensibly counsels appropriate caution in finding technical

inaccuracies to be materially misleading, it does not militate in favor of dismissal here.  While

the inaccurate "from" line in *Omega World Travel* referred to a non-functional email address that

was otherwise meaningless to the email's recipients, the inaccurate "from" line here identified

the email author as a Verizon manager.[12]  Importantly, a message concerning working conditions

or benefits at Verizon might have more credibility coming from a putative Verizon manager than

an outsider.  Thus, the misleading header information may have affected an objective recipient's

opinion of the value of joining CWA.  *See* 70 Fed. Reg. at 3115 (material fact under the Act is

one "likely to affect a consumer's choice . . . regarding a product.  In other words, it is

information important to consumers.").  In these circumstances, it is inappropriate to conclude, as

a matter of law, that the misleading header information is immaterial.

Because defendants have not shown, as a matter of law, that the emails were not

misleading, it is unnecessary, strictly speaking, to address their contention that the emails are not

infirm on the grounds that they lack adequate opt out information, a valid physical return address,

and conspicuous notice that they are advertisements.[13]  Yet, as a matter of sound judicial

husbandry, brief analysis of those contentions is nonetheless in order.  Defendants first contend

that, because the emails indicated that no more emails would be forthcoming, it makes no sense

to apply the opt out requirement.  But the statute itself makes no such exception, and there is no

warrant for reading one into the Act.  Simply because a message states that no further messages

---

[12] Since reasonable inferences are drawn in the plaintiff's favor at the threshold stage, it is
appropriate to presume that at least one of the recipients of the emails would have recognized the
misappropriated names as belonging to Verizon managers.

[13] Defendants do not contest that the emails do not contain a valid physical return address.
This is a violation of the Act, and a private action may be maintained thereon so long as a
"pattern or practice" of such violations is alleged.  *See* 15 U.S.C. § 7706(g).

will be forthcoming does not guarantee that this is so.  To read the Act as defendants suggest would invite spammers to falsely claim no further emails would be forthcoming.

Defendants next contend the emails contained adequate opt out information, because they contained a functioning return email address, as well as (in one case) Arnold's business email address, and (in another case) an email address recipients could use to subscribe to CWA's e-newsletter.  Yet, such return opt out information was certainly not "conspicuously displayed," nor was the "manner specified in the message" by which opting out could occur.  15 U.S.C. § 7704(a)(3)(A)(i).  A recipient would have had to guess or surmise that these email addresses were appropriate methods of opting out, and the Act sensibly appears to require more, namely, that the email contain a "functioning return electronic mail address or other Internet-based mechanism, clearly and conspicuously displayed, that a recipient may use to submit, in a manner specified in the message, [a reply email or similar communication] requesting not to receive future [emails]."  *Id.*  While these emails had a functioning return address, it was not conspicuously displayed as a method of opting out, nor was it specified as a manner of doing so within the body of the emails.  Thus, it appears that the opt out claim also survives the motion to dismiss.[14]

In sum, the emails promote "commercial services," and thus are subject to the Act.  Subjecting these emails to the Act does not violate the First Amendment.  On the merits, it is inappropriate to conclude as a matter of law that the emails do not violate the Act.  Accordingly,

---

[14] The Act similarly requires that commercial emails must be conspicuously identified as advertisements or solicitations.  15 U.S.C.§ 7704(a)(5)(A)(i).  The defendants' claim that the emails comply with the Act because they are obviously solicitations thus fails for the same reason, namely, the Act requires commercial emails to be specifically identified as advertisements.

the motion to dismiss the CAN SPAM Act claim must be dismissed.

An appropriate Order has issued.


_____/s_____

Alexandria, Virginia                                    T. S. Ellis, III
July 12, 2007                                           United States District Judge